IN IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

MULTISCAFF LIMITED,
    Plaintiff,

    v.                                      Civil No. 1:23cv1369 (DJN)

APTIM FEDERAL SERVICES, LLC,
    Defendant.

### MEMORANDUM OPINION

At issue in this breach of contract action is a simple question: who pays? Plaintiff Multiscaff Limited ("Multiscaff") was hired by subcontractor Ferrous Protection Limited ("FPL") to provide scaffolding and other materials for a construction project on the island of Diego Garcia. FPL was in turn retained by Defendant Aptim Federal Services, LLC ("APTIM"), the general contractor for the project. FPL's performance fell flat, leading APTIM to terminate and replace FPL. Termination contractually entitled APTIM to retain all material then in use by FPL — including Multiscaff's materials. Multiscaff believes that APTIM's right of retention came with a corresponding commitment to compensate Multiscaff. But in APTIM's view, FPL was the only party contractually obliged to pay. Multiscaff posits that APTIM wants to have its cake and eat it too, receiving all of the benefits that flowed from Multiscaff without assuming any of the liabilities. APTIM views this as a case of sour grapes. Multiscaff, in APTIM's view, was content to be reimbursed by FPL until FPL became insolvent, at which time Multiscaff turned its gaze to the one party with the means to pay. There is no dispute that from December 2020 to the present, APTIM retained and used Multiscaff's materials, and that Multiscaff was not

paid for this use.  Nor is there any dispute that Multiscaff has a legal claim for reimbursement. The only question is who must pay — APTIM or FPL?

Multiscaff sued APTIM for unjust enrichment, quantum meruit, conversion, and after amendment of the complaint, breach of contract.  APTIM responded with a counterclaim for breach of contract.  The parties have now filed cross motions for summary judgment.  For the reasons that follow, the Court will GRANT IN PART and DENY IN PART APTIM's motion for summary judgment (ECF. No. 61).  In addition, the Court will DENY Multiscaff's motion for partial summary judgment (ECF. No. 64).  Specifically, APTIM is entitled to judgment as a matter of law on Multiscaff's claim for quantum meruit.  The motions are denied in all other respects.

## I.  SUMMARY JUDGMENT EVIDENCE

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once the movant has met its burden of showing that there is no material dispute, the nonmovant must then demonstrate with specific evidence that there exists a genuine disputed issue of material fact. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All "justifiable inferences are to be drawn in the [nonmovant's] favor." *Id.* at 255.  However, the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

Because summary judgment requires an assessment of the undisputed facts, Local Civil Rule 56(b) directs a movant to include an enumerated list of material facts as to which the movant

contends that no genuine dispute exists. The nonmovant must then respond by stating whether the fact is disputed or admitted, and if disputed, to provide citations to evidence in the record supporting the claim of a factual dispute. The following undisputed facts are derived from the parties' submissions and the factual record:

- Multiscaff is a limited liability company incorporated in the United Kingdom with a principal place of business in Lancashire, England. (ECF No. 90 ("Am. Compl.") ¶ 2.)

- APTIM is a Louisiana limited liability company headquartered in Baton Rouge, Louisiana. APTIM's principal place of business was previously Alexandria, Virginia, but APTIM relocated to Baton Rouge in July 2020. APTIM's sole member is Aptim Government Solutions, LLC, a Louisiana limited liability company. The sole member of Aptim Government Solutions is Aptim Corp., a Delaware corporation with its principal place of business in Louisiana. (ECF No. 10 ("Corporate Disclosure")); (ECF No. 20-1 ("Aidan Delgado Decl.") ¶¶ 3, 5.)

- On February 28, 2017, APTIM entered an indefinite delivery, indefinite quantity contract (the "IDIQ Contract") (ECF No. 45-1) with the Air Force Civil Engineering Center ("AFCEC"). [1] Under the IDIQ Contract, AFCEC would issue individual task orders to APTIM. (ECF No. 75-1 (APTIM's Response to Multiscaff's Statement of Facts (hereinafter, "AR_SOF") ¶ 2)).

- Pursuant to the IDIQ Contract, on July 25, 2018, AFCEC issued a task order to APTIM to repair storage tanks located at Naval Support Facility Diego Garcia, a military installation in the British Indian Ocean Territory (hereinafter, the "Project" and, as to the task order, the "Prime Contract"). AR_SOF ¶ 3; (ECF No. 39-1 ("Prime Contract") at 1, 5).

- On December 1, 2018, APTIM entered a subcontract with FPL (the "AF Contract") (ECF No. 34-1), a U.K. corporation, under which FPL was to provide APTIM with material and equipment related to the Diego Garcia Project. In exchange, APTIM agreed to pay FPL a fixed lump sum of $4,486,560. The AF Contract was negotiated and executed in Dallas, Texas. AR_SOF ¶¶ 5–6; (ECF No. 79-1 (Multiscaff's Response to APTIM's Statement of Facts (hereinafter, "MR_SOF") ¶ 2)); (ECF No. 49 (Mem. Op. on Mot. to Dismiss (the "MTD Op.") at 4)); AF Contract at 2.

- The AF Contract incorporated Standard Terms and Conditions ("T&Cs"), which required FPL to obtain the prior written approval of APTIM before FPL subcontracted

---

[1]   An IDIQ contract "allows an indefinite quantity of services for a fixed time. This method is used when a contracting agency anticipates a recurring need but has not determined, above a specified minimum, the precise quantities of services that it will require during the contract period." 23 C.F.R. § 635.602.

any part of FPL's work.  Any subcontractors to FPL were to be bound to the obligations of the AF Contract.  FPL was responsible for payment to subcontractors, and APTIM was to be made a third-party beneficiary of any subcontracts.  AF Contract T&Cs § 10.

- In the event of a breach by FPL, APTIM was entitled to terminate the AF Contract and "to take possession of and use any of the materials, tools, equipment, supplies and other property then in use by [FPL] for such Subcontract Work or present on the Project site." The cost of completing any of FPL's outstanding work was to be charged to FPL. Additionally, upon termination, FPL was required to "[a]ssign to [APTIM] subcontracts . . . and any and all other agreements, as designed by [APTIM]."  AF Contract T&Cs § 25.

- The AF Contract is governed by Virginia law.  MTD Op. at 8–11; AF Contract T&Cs § 30.

- On January 29, 2019, FPL entered a subcontract with Multiscaff (the "FM Contract"), under which Multiscaff was to provide scaffolding, sheeting and support personnel for the Project.  The FM Contract is "back to back" with the AF Contract.[2]  APTIM was not a party to the FM Contract.  FM Contract at 1–2 (ECF No. 65-3); MR_SOF ¶¶ 4–5; AR_SOF ¶ 11.

- The FM Contract was to begin when the last shipping container of Multiscaff's material left Multiscaff's depot and was to conclude when the last container was returned to the depot.  FPL was responsible for shipping both ways.  FM Contract at 2.

- Multiscaff was to be paid £750,564 for scaffolding, sheeting and labor.  The FM Contract also contemplated that Multiscaff's services may be necessary "for an extended hire" and provided that Multiscaff would be compensated at a rate of £2,000 per week for any work lasting longer than 26 weeks.  *Id.*

- FPL experienced financial difficulties throughout the Project.  In December 2019, APTIM and FPL agreed to restructure the AF Contract into a "continuation of services agreement," which changed how APTIM compensated FPL from a fixed price payment to payment for cost.  MR_SOF ¶ 9; AR_SOF ¶ 20.

- In February 2020, FPL agreed to pay Multiscaff for additional supplies necessary to complete the Project.  Those supplies were subsequently shipped to Diego Garcia. AR_SOF ¶ 16.

---

[2]       The term "back to back" is "an industry term indicating that the conditions in a subcontract coordinate with the conditions in a main agreement . . . . The goal of employing a 'back to back' condition is to avoid creating disparities between the subcontract and the main contract."  MTD Op. at 18 (citing General Contract Clauses: Subcontracting, "Subcontract Back-to-Back with Main Contract," Practical Law Standard Clauses 3-521-4457, WestLaw (2023)).

4

- On December 19, 2020, FPL informed Multiscaff that FPL was terminating the FM Contract pursuant to the Default Clause, Section 25, of the T&Cs. FPL retained and continued to use Multiscaff's scaffolding and other materials after purportedly terminating the FM Contract. Termination Letter (ECF No. 62-3); AR_SOF ¶¶ 18–19.

- FPL's financial condition continued to deteriorate. In May 2021, APTIM discharged FPL pursuant to Section 25 and replaced FPL with a new subcontractor, CMAX. APTIM continued to use Multiscaff's materials after FPL's termination, but APTIM did not pay FPL, CMAX or Multiscaff for this use. MR_SOF ¶¶ 9–11; AR_SOF ¶¶ 18, 32.

- In August 2021, FPL entered administration in the United Kingdom.[3] As a result, FPL informed APTIM that APTIM would need to negotiate directly with Multiscaff regarding the continued use of Multiscaff's scaffolding and related services. AR_SOF ¶¶ 27–28; Pl. Br. Ex. 17, August 23, 2021 Email from J. King to T. Schmidt, at 8 (ECF No. 65-18).

- The same month, APTIM informed Multiscaff that APTIM intended to containerize Multiscaff's materials and ship them to Singapore. Three containers of scaffolding equipment were subsequently shipped to Singapore in May 2022. The parties dispute whether the containers housed Multiscaff's equipment and whether Multiscaff's materials are in Singapore or remain on Diego Garcia. MR_SOF ¶¶ 12–14; AR_SOF ¶ 36.

- Multiscaff has not received payment for the use of its equipment since December 2020, when FPL purported to terminate the FM Contract, nor have Multiscaff's materials been returned to Multiscaff. AR_SOF ¶ 19.

On January 10, 2023, Multiscaff brought suit in the Richmond Division of this District. APTIM moved to dismiss for lack of personal jurisdiction and improper venue. That motion was denied as to lack of jurisdiction but deferred on venue so that the parties could file supplemental briefing. *See* Briefing Order at 1 (ECF No. 51). Following that briefing, Judge Young of the Richmond Division held that venue properly lies in the Alexandria Division and ordered that this matter be transferred pursuant to 28 U.S.C. § 1406(a). *See* Transfer Order at 1 (ECF No. 74). The parties have now filed cross motions for summary judgment. Both parties seek summary

---

[3]   Administration in the United Kingdom is the equivalent of Chapter 11 bankruptcy in the United States.

judgment on Multiscaff's unjust enrichment claim, APTIM seeks summary judgment on Multiscaff's claims for quantum meruit and conversion, and Multiscaff seeks summary judgment on Multiscaff's breach of contract claim. Neither party has moved for summary judgment on APTIM's counterclaim for breach of contract, and that claim is accordingly not addressed here.

## II.   CONTRACT CONSTRUCTION

Before resolving the merits of the parties' motions, the Court must first address the proper construction of the contracts at the heart of this matter. The parties agree that the AF and FM contracts are governed by Virginia law, and that the terms and conditions of the AF Contract were incorporated into the FM Contract. But the parties vigorously contest how that incorporation affects the rights and obligations between Multiscaff and APTIM, particularly the default clause found in Section 25 of the T&Cs. In Multiscaff's telling, Section 25 granted APTIM a right to use Multiscaff's materials in the event of FPL's termination. Along with that right came a corresponding obligation for APTIM to pay Multiscaff for such use. APTIM predictably sees things differently. In APTIM's view, Section 25 granted FPL a right to retain Multiscaff's materials upon Multiscaff's termination, which FPL properly exercised. When APTIM later discharged FPL, APTIM was entitled to all of FPL's equipment — including equipment owned by Multiscaff. But the obligation to pay Multiscaff remained where it always had, with FPL. Because there was no direct contract between APTIM and Multiscaff, APTIM could not have agreed to compensate Multiscaff.

In Virginia, contract interpretation constitutes a question of law. *PBM Nutritionals, LLC v. Lexington Ins. Co.*, 724 S.E.2d 707, 712–13 (Va. 2012). The "guiding light" in contract interpretation focuses on "the intention of the parties as expressed by them in the words they have used." *W.F. Magann Corp. v. Virginia–Carolina Elec. Works, Inc.*, 123 S.E.2d 377, 381

6

(Va. 1962).  When contract language qualifies as unambiguous, it must be interpreted according to its plain meaning.  *PMA Cap. Ins. Co. v. U.S. Airways, Inc.*, 626 S.E.2d 369, 372–73 (Va. 2006).  That requires giving the "[w]ords that the parties used . . . their usual, ordinary, and popular meaning," and ensuring that "[n]o word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it." *Id.* (quoting *D.C. McClain, Inc. v. Arlington Cnty.*, 452 S.E.2d 659, 662 (Va. 1995)).  A contract is ambiguous when it is capable of "two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time." *Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 455 S.E.2d 229, 232 (Va. 1995) (quoting *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983)).  However, "[a] contract is not ambiguous merely because the parties disagree as to the meaning of the terms used." *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002).  If a contract is ambiguous, a court may "resort to parol evidence to ascertain the true intention of the parties." *Aetna Cas. & Sur. Co.*, 455 S.E.2d at 232.  Additionally, the Virginia Supreme Court has "consistently held that in the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement." *Drs. Co. v. Women's Healthcare Assocs., Inc.*, 740 S.E.2d 523, 526 (Va. 2013) (collecting cases) (internal quotations and alterations omitted).

### A.    The Flow Down Clause

The following provisions of the AF and FM Contracts are key to the parties' dispute:[4]

> Subcontractor shall not subcontract the whole of the Subcontract Work.  Subcontractor shall not subcontract any part of the Subcontract Work without prior written approval of Company.  **Any lower tier sub-subcontractor retained must be contractually bound to all obligations set forth herein just as Subcontractor is bound to Company.** Subcontractor further agrees to bear sole responsibility for payment of any amounts to

---

[4]    The term "client" in the AF Contract refers to AFCEC, the term "company" refers to APTIM, the term "subcontractor" refers to FPL and the term "parties" refers to APTIM and FPL.

lower tier sub-subcontractors. **Company shall be made a third party beneficiary of all lower tier subcontracts**.

AF Contract T&Cs § 10 (emphasis added).

Section 10 is ambiguous on its face. The clause requires Multiscaff to be bound to all obligations, just as FPL is bound to APTIM. That requirement unambiguously necessitates reading Multiscaff in place of FPL (*i.e.*, as the "Subcontractor" in the T&Cs) when incorporating the T&Cs in the FM Contract. But Section 10 could be read to mandate either that (i) FPL replace APTIM as the "Company" in the T&Cs or (ii) APTIM remain the "Company" in the FM Contract's T&Cs. A careful review of similarly structured contracts, caselaw and industry treatises, and of a similar clause in the Prime Contract persuasively demonstrates that the first interpretation is required as a matter of law.

The requirement that "[a]ny lower tier sub-subcontractor . . . be contractually bound to all obligations . . . just as Subcontractor is bound to Company" constitutes a common condition in construction contracts known as a "flow down" clause. 1A *Bruner & O'Connor on Construction Law* § 3:64 (2023). Flow down clauses serve as a form of incorporation by reference and are "commonly used in construction contracts to allow a subcontractor to 'assume toward the general contractor all of the obligations and responsibilities the contractor assumes toward the owner in the [prime] contract.'" *Centex/Worthgroup, LLC v. Worthgroup Architects, L.P.*, 365 P.3d 37, 40 n.3 (N.M. Ct. App. 2016) (quoting T. Bart Gary, *Incorporation by Reference and Flow–Down Clauses*, 10 Constr. Law 1, 46 (1990)). The purpose of a flow down clause is to promote "contractual consistency" between a prime contract and one or more subcontracts by requiring "subcontractors [to] commit themselves to the performance and administrative requirement of the prime contract." *Steadfast Ins. Co. v. Brodie Contractors, Inc.*, 2008 WL 4780099, at *1 (W.D. Va. Oct. 31, 2008); 2 Justin Sweet & Jonathan J. Sweet, *Sweet on*

8

*Construction Industry Contracts* § 17.05[A] at 567 (4th ed. 1999).  Of course, a flow down clause in a prime contract cannot bind a lower tier subcontractor of its own force; rather, the flow down clause requires the contractor to structure any subsequent subcontracts such that the contractor's obligations under the prime contract "flow down" to the subs.  2 Bruner & O'Connor at § 5:137.

As applied here, Section 10 required FPL to structure the FM Contract to bind Multiscaff to all obligations in the AF Contract in the same manner that FPL was bound to the obligations in the AF Contract.  Multiscaff's assent to those terms can be found in the FM Contract, which provides:  "Conditions of Contract.  These will be back to back as per our contract – copy supplied."  FM Contract at 2.[5]  A back to back clause indicates "that the conditions in a subcontract coordinate with the conditions in a main agreement."  MTD Op. at 18 (citing General Contract Clauses:  Subcontracting, "Subcontract Back-to-Back with Main Contract," Practical Law Standard Clauses 3-521-4457, WestLaw (2023)); *see also Oilex A.G. v. Mitsui & Co. (U.S.A.)*, 669 F. Supp. 85, 86 (S.D.N.Y. 1987) (explaining that a back to back contract is meant to incorporate the terms of one contract into another).  Thus, the T&Cs of the AF Contract are as much a part of the FM Contract as if they had been independently enumerated, with the subcontracting parties — FPL and Multiscaff — assuming "the correlative position of the parties to the [AF] contract."  *Indus. Indem. Co. v. Wick Const. Co.*, 680 P.2d 1100, 1104 (Alaska 1984) (citing A. Dib, *Forms and Agreements for Architects, Engineers and Contractors*, Chap. 7, § 1[1] (1979)).  That reading is further confirmed by the Prime Contract's flow down clause, which is incorporated into the AF Contract.  *See* AF Contract Attachment F.  In that provision,

---

[5]   The FM Contract indicates that a copy of the T&Cs of the AF Contract was provided to Multiscaff upon signing the FM Contract.  *See id.* (specifying in the signature block that Multiscaff's representative received a copy of the T&Cs).

the AF Contract specifies that, to incorporate the terms of the Prime Contract, "the terms 'Contractor' and 'Contract' shall mean, respectively 'Subcontractor' and 'Subcontract'"; the "term 'subcontractor' shall mean the 'lower-tier subcontractor'"; and the "term[] 'Government' . . . shall mean '[APTIM].'" The AF Contract thus contemplates that each party to the AF Contract would, in effect, step into the shoes of the party one level up the chain to flow down the Prime Contract's obligations.  Absent contrary evidence, the most natural reading of Section 10's flow down would mirror the operation of the Prime Contract's flow down.  Therefore, any references to "subcontractor" in the T&Cs must be read to mean Multiscaff and any reference to "Company" must be read to mean to FPL, unless the context of the particular provision being incorporated indicates that the parties intended a different result.  *Cf. Nelson v. Vernco Constr., Inc.*, 566 S.W.3d 716, 752 (Tex. App. 2018), *judgment set aside, opinion not vacated* (June 22, 2018) (noting that the particular "text of the contracts" will ultimately control "what responsibilities flow down and what rights flow up").

## B.     The Default Clause

With this understanding in mind, interpretation must next move to the default clause of the T&Cs, which provides, in relevant part:

> **If, in Company's sole discretion,** any or all Subcontract Work to be performed under a Subcontract is abandoned by Subcontractor; or **Subcontractor fails to meet its** payroll or other **current obligations . . . or the schedule of the Subcontract work is not being maintained; or Subcontractor is in breach of** or is otherwise violating any of the conditions, provisions, obligations or representations contained in **these T&C's . . . Company may . . . terminate a Subcontract or Subcontracts, or these T&C's,** by issuance of a written termination notice to Subcontractor.

> **Upon termination pursuant to this Section . . . Company shall have the right to take possession of and use any of the materials,** tools, equipment, supplies and other property **then in use by Subcontractor for such Subcontract Work or present on the Project site.  The expense of completing such Subcontract Work,** including any additional design, administration, legal or other costs, **will be charged to Subcontractor, and such expense shall be deducted from such amounts that might otherwise be due**

**Subcontractor**.  If such expense exceeds the sum otherwise due Subcontractor, Subcontractor shall be liable for and shall promptly pay such amount to Company.

**Upon receipt of** any such **written termination** notice, **Subcontractor shall**, at its expense, for that Subcontract Work affected by any such termination:
- **Assign to Company subcontracts**, supply contracts, equipment rental agreements **and any and all other agreements**, as designated by Company.

AF Contract T&Cs § 25 (emphasis added).

Distilled to its essence, Section 25 grants the Company (either APTIM or FPL, as to the AF and FM Contract respectively) a unilateral right to terminate the contract and take possession of the subcontractor's materials if the subcontractor breaches the contract or otherwise fails to perform.  However, Virginia law allows for recission of a contract only in the event of a material breach, *see Neely v. White*, 14 S.E.2d 337, 340–41 (Va. 1941), which Virginia courts define as "a failure to do something that is so fundamental to the contract that the failure to perform the obligation defeats an essential purpose of the contract." *Countryside Orthopaedics v. Peyton*, 541 S.E.2d 279, 285 (Va. 2001) (quoting *Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997)). Parties may contract around the materiality requirement to permit contract termination for any breach, but their intention must be unambiguous.  *See* 4A *Michie's Jurisprudence*, Contracts, § 74 (1999).  Thus, language permitting contract termination if a party "fails to perform any of its obligations pursuant to this Agreement" or "default[s] in any of its obligations" under the contract has been found insufficient to abrogate the materiality requirement. *RW Power Partners, L.P. v. Virginia Elec. & Power Co.*, 899 F. Supp. 1490, 1502 (E.D. Va. 1995); *S. Auburn L.P. v. Old Auburn Mills, L.P.*, 68 Va. Cir. 145, 150, 153–54 (2005).  Rather, the contract "must clearly state that any [] breach may serve to cancel the agreement, whether

material or not." *S. Auburn L.P.*, 68 Va. Cir. at 154.[6] For that reason, the Company's unilateral termination rights in the event of breach must be read to include only material breaches of the contract.[7]

According to Multiscaff, Section 25 created a "set of rights and obligations between Aptim and Multiscaff," wherein Multiscaff granted APTIM a right to Multiscaff's equipment in the event of FPL's termination and APTIM assumed an obligation to pay Multiscaff should APTIM exercise its Section 25 rights. Pl. Br. at 8. Multiscaff is narrowly correct, insofar as nothing in Section 25 obviates the obligation of the invoking party to pay for ongoing use of the breaching party's materials. Indeed, Section 25 plainly contemplates that the Company will owe payment to the subcontractor by permitting the Company to "deduct[]" the expense of

---

[6]     In this sense, Virginia applies a clear statement rule that adopts a strong presumption against abrogation of the materiality requirement, which can only be overcome by "unambiguous [] text targeted at the specific problem." William N. Eskridge, Jr. & Phillip P. Frickey, *Quasi-Constitutional Law; Clear Statement Rules as Constitutional Lawmaking*, 45 Vand. L. Rev. 593, 611–12 (1992).

[7]     It is not clear, however, that the Company's invocation of Section 25 is subject to any good faith requirement. Virginia's Uniform Commercial Code ("UCC") imposes an obligation of good faith in the performance and enforcement of every contract subject to the UCC. *See* Va. Code. § 8.1A–304. Courts are split on whether non-UCC contracts have a similar duty. *Compare Dominion Bank of Richmond v. Star Five Assoc., Inc.*, 24 Va. Cir. 223, 230 (1991) (stating that Virginia has "no general common law obligation of good faith in all contract cases"), *and Harrison v. U.S. Bank Nat'l Ass'n*, 2012 WL 2366163, at *2 (E.D. Va. June 20, 2012) ("Virginia [] does not recognize an implied covenant of good faith and fair dealing in contracts outside of those governed by the [UCC]."), *and S. Bank & Tr. Co. v. Woodhouse*, 92 Va. Cir. 402, 409 (2016) (declining to imply an implicit good faith duty to contracts dealing with "the creation and transfer of interests in real property," because such contracts are outside the UCC), *with Carr v. Fed. Nat'l Mortg. Ass'n*, 92 Va. Cir. 472, 477 (2013) ("Under Virginia law, every contract contains an implied covenant of good faith and fair dealing."), *and Cagle v. CitiMortgage, Inc.*, 2015 WL 2063990, at *8 (E.D. Va. May 1, 2015) ("Contracts governed by Virginia law, including those governing [real property], contain an implied covenant of good faith and fair dealing."). As explained *infra* § III.B., whether the FM Contract was subject to an implied covenant of good faith and fair dealing could affect the propriety of FPL's revocation of the FM Contract.

completing the subcontractor's outstanding work "from such amounts that might otherwise be due Subcontractor." T&Cs § 25.  And no language in Section 25 purports to limit what would otherwise be due to the Subcontractor for the use of its materials.  Thus, when properly invoked, Section 25 permits the Company (either APTIM as to FPL or FPL as to Multiscaff) to terminate either the T&Cs or the entirety of the contract, retain possession of the subcontractor's equipment and deduct any added expense for completing the subcontractor's work from any payments due to the subcontractor.  But that is where Multiscaff's reading of the contract runs out.  The flow down clause of the T&Cs created terms between FPL and Multiscaff, not APTIM and Multiscaff.  APTIM therefore did not assume any obligations directly to Multiscaff.  Nor did APTIM ever purport to invoke Section 25 against Multiscaff.  Rather, FPL first enforced Section 25 of the FM Contract against Multiscaff and APTIM later enforced Section 25 of the AF Contract against FPL.  APTIM and Multiscaff's joint connection to a mutual intermediary, FPL, forged no direct link between APTIM and Multiscaff.

Multiscaff claims that a contrary interpretation already constitutes the law of the case.  *See* Pl. Suppl. Br. at 8 (ECF No. 120).  The doctrine of law of the case "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983), *decision supplemented*, 466 U.S. 144 (1984).  Law of the case is a prudential recognition that "satisfactor[y] and efficient[]" adjudication sometimes requires that "a question once considered and decided" not be "litigated anew in the same case." *Great W. Tel. Co. v. Burnham*, 162 U.S. 339, 344 (1896).  However, the doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided;" it is "not a limit to their power." *Messenger v. Anderson*, 225 U.S. 436, 444 (1912); *accord Arizona*, 460 U.S. at 618 ("Law of the case directs a

13

court's discretion, it does not limit the tribunal's power."). In exercising that discretion, the Supreme Court has instructed that "courts should be loathe to [revisit prior decisions] in the absence of extraordinary circumstances." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). Such circumstances may arise (i) where "substantially different evidence" is developed after the determination, (ii) where "controlling [legal] authority" has changed since the time of decision, or (iii) where "the prior decision was clearly erroneous" and, if uncorrected, would result in "manifest injustice." *TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009).

Earlier in this litigation, Judge Young was required to interpret the T&Cs forum selection clause, contained in Section 31, which states in relevant part:

> If the Parties are unable to resolve [a dispute between Company and Subcontractor arising out of or relating to these T&Cs or a Subcontract] . . . **the sole and exclusive venue for any litigation between Company and Subcontractor . . . shall be the United States District Court for the Eastern District of Virginia**, or, should that court lack jurisdiction, Alexandria Circuit Court.

AF Contract T&Cs § 31 (emphasis added).

Multiscaff sought to enforce Section 31's forum selection clause against APTIM to overcome APTIM's objections to personal jurisdiction and venue. In resolving that issue, Judge Young held that the forum selection clause flowed down pursuant to Section 10 of the T&Cs, and that Multiscaff could enforce the forum selection clause against APTIM. Judge Young reasoned that where the T&Cs contain an obligation that binds APTIM and FPL bilaterally and equally, that obligation flows down to Multiscaff and can be enforced by and between APTIM and Multiscaff. The court noted that unilateral obligations that FPL owed to APTIM may have a different rule; namely, that the obligation grants APTIM rights against Multiscaff but does not grant any reciprocal rights to Multiscaff against APTIM. MTD Op. at 15–18. According to Multiscaff, this decision necessarily decided that the T&Cs were enforceable between APTIM

14

and Multiscaff, and thus APTIM could enforce Section 25 against Multiscaff but would assume the obligation to pay Multiscaff in so doing.

There is no need to revisit Judge Young's ruling as it applies to Section 31. This Court has not been asked to — and will not — relitigate the enforceability of the forum selection clause, or whether personal jurisdiction and venue is proper. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) (noting that personal jurisdiction and venue are "personal privileges of the defendant" that "may be waived"). But Judge Young did not purport to interpret any other contractual clause. Law of the case stands for the narrow proposition that "the *same* issue presented a second time in the *same* case in the *same court* should lead to the *same result.*" *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (*en banc*). It "does not come into play when the transferor judge never decided the precise issue that is before the successor judge." *Gilbert v. Illinois State Bd. of Educ.*, 591 F.3d 896, 903 (7th Cir. 2010). The material dispute between APTIM and Multiscaff on the motion to dismiss involved whether Section 31 flowed down in the first instance. *See* MTD Op. at 15–16. The court was not briefed on nor asked to decide how the flow down worked as to all clauses in the T&Cs. Indeed, Judge Young was not even offering an interpretation of the FM Contract. *See id.* at 16 (describing the FM Contract as "extrinsic evidence" used to interpret the AF Contract). Yet it is the incorporation of the T&Cs in the FM Contract that led the terms to "flow down" to Multiscaff. No contract exists between Multiscaff and APTIM, and the court's ruling could not conjure contractual privity where none exists. Thus, this Court will follow Judge Young's reading of Section 31 as law of the case, but will not extend his reasoning beyond the issue squarely presented and decided in his ruling.

15

### III.    IMPLIED CONTRACTS

Before proceeding to the merits, two other threshold issues must be addressed, the first relating to choice of law and the second to the parties' terminology.

*First*, the contractual choice of law clause in the T&Cs governs only the contracts and their interpretation. *See* AF Contract T&Cs § 30. Two of Multiscaff's claims sound in restitution and tort respectively and the third, although contractual in nature, stands predicated on the lack of an express contract governing the subject matter. S*ee* Supplemental Briefing Order at 1–2 (ECF No. 114). However, the Fourth Circuit has instructed that choice of law issues are waivable by the parties. *Wiener v. AXA Equitable Life Ins. Co.*, 58 F.4th 774, 780–82 (4th Cir. 2023). Because APTIM and Multiscaff both agree that Virginia law should govern all claims, *see* Def. Suppl. Br. at 1 (ECF No. 119); Pl. Suppl. Br. at 2, any contrary choice of law has been waived.

*Second*, as relates to Multiscaff's causes of action, a quasi-contract, or contract implied in law, does not constitute an actual contract but instead an obligation imposed by law to prevent a defendant's unjust enrichment. *T. Musgrove Constr. Co., Inc. v. Young*, 840 S.E.2d 337, 341 n.3 (Va. 2020). A contract implied-in-fact arises when no actual agreement exists between the parties based on their conduct, but the express terms have not been agreed to in words. 1 Williston on Contracts §§ 1:5–1:6 (4th ed.). Quantum meruit (literally, "as much as is deserved") serves a measure of damages for quasi-contracts and implied-in-fact contracts, not an independent theory of liability. *T. Musgrove Constr. Co.*, 840 S.E.2d at 341. When used in relation to an implied-in-fact contract, quantum meruit is a measure of contract damages when an enforceable contract lacks a price term. As used in relation to a quasi-contract, quantum meruit is a measure of restitution absent an enforceable contract. Under a theory of unjust enrichment,

however, the ordinary measure of the plaintiff's damages constitutes the value of the benefit conferred on the defendant.  In contrast, the remedy of quantum meruit is the reasonable value of the services provided by the plaintiff.  *T. Musgrove Constr. Co.*, 840 S.E.2d at 341–42.  Although these two measures may be the same, they need not be.  *Id.*  Multiscaff's claim of unjust enrichment arises from a theory of quasi-contract while Multiscaff's claim of quantum meruit derives from a theory of an implied-in-fact contract.  With these understandings in mind, the analysis proceeds to Multiscaff's quantum meruit and unjust enrichment claims.

### A.    Quantum Meruit

Turning first to Multiscaff's quantum meruit claim, APTIM argues that no contract was implicitly formed between APTIM and Multiscaff and that no implied contract could be found because an express contract already governed the use of Multiscaff's equipment.  Viewing all of the evidence in the light most favorable to Multiscaff, Multiscaff has failed to show the existence of an implied-in-fact contract, and its quantum meruit claim must accordingly fail.

An implied-in-fact contract is a contract "inferred from the circumstances or acts of the parties" rather than their words.  *Klebe v. United States*, 263 U.S. 188, 192 (1923).  Such circumstances often arise when the parties expressly contract, but there is some issue with the price term or, in some instances, when the contract is later found void.  *T. Musgrove Constr. Co.*, 840 S.E.2d at 341.  An implied contract is "no different from [an] express contract[] except that" some of the terms are "inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."  *Spectra-4, LLP v. Uniwest Com. Realty, Inc.*, 772 S.E.2d 290, 293 (Va. 2015); *Hercules Inc. v. United States*, 516 U.S. 417, 424 (1996).  For that reason, an implied-in-fact contract requires the same elements as an express contract, namely, mutual assent, offer, acceptance, consideration, legal capacity and lawful subject matter.

17

1 Williston at § 1:5; *see also Spectra-4, LLP*, 772 S.E.2d at 295 (holding the same as a matter of Virginia contract law).   Whether the parties' conduct indicates mutual assent is evaluated from the perspective of a reasonable person under the circumstances, accounting for the parties' communications, ordinary course of dealing and industry custom.  1 Williston at § 1:5. Additionally, manifestation of assent cannot be based solely on appearances; a party must engage in intentional conduct that it knows or has reason to know will cause the other party to believe that there is assent.  Restatement (Second) of Contracts § 19 cmt. c.  (Am. L. Inst. 1981). Consequently, an implied-in-fact contract may only be found where the defendant requested the plaintiff's services.  *T. Musgrove Constr. Co.*, 840 S.E.2d at 341.  And "it is hornbook common law that courts will not infer an implied-in-fact contract where an express contractual provision" exists that covers the same subject matter. *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 224 (3d Cir. 2014); *see Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009) (same).  But this rule "is less clearly applicable when the express contract is not directly between the parties to the implied-in-fact contract."  1 Williston at § 1:5.  An express contract may only preempt an implied-in-fact contract where "there is an express, enforceable contract between the parties covering the services for which quantum meruit recovery is claimed." *Mongold*, 677 S.E.2d at 292; *see also Peter v. United States*, 6 Cl. Ct. 768, 780 (1984) (stating that the "rule that the existence of an express contract preempts an implied contract has full effect . . . only when the parties to both contracts are the same").  Accordingly, to be entitled to summary judgment, APTIM must demonstrate that there exists no genuine issue of material fact as to (i) whether APTIM's conduct satisfied the necessary elements of contract formation or (ii) whether payment for Multiscaff's

services after termination was not already controlled by an express contract. Because APTIM satisfies the first of these requirements, summary judgment must be granted.

Multiscaff highlights three pieces of evidence to support its implied-in-fact contract claim. *First*, after termination of the FM Contract, FPL advised APTIM that further hire of the scaffolding would need to be negotiated directly with Multiscaff. *See* Pl. Br. Ex. 17 at 7 (ECF No. 65-18). In Multiscaff's telling, this communication created mutual assent. Pl. Opp. Br. at 8 (ECF No. 79). Not so. Mutual assent requires a "meeting of the minds of the parties" forming "a distinct intention common to both and without doubt or difference." *Lacey v. Cardwell*, 217 S.E.2d 835, 843 (Va. 1975); *Persinger & Co. v. Larrowe*, 477 S.E.2d 506, 509 (Va. 1996). FPL's understanding of APTIM's future obligations is irrelevant as to whether APTIM and Multiscaff formed a contract. And FPL had no power to bind APTIM. Nor is there any evidence that APTIM explicitly or implicitly adopted FPL's representation. Indeed, there is no indication that APTIM responded to FPL's communication at all. Consequently, FPL's representations provide no basis to alter the legal relationship between APTIM and Multiscaff.

*Second*, Gary Hayes, a director at Multiscaff, exchanged emails with Todd Schmidt, APTIM's programs director, between August and November 2021. Multiscaff asserts that the Hayes-Schmidt emails formed the implied contract. This evidence is unpersuasive. The following timeline of communications is relevant to Multiscaff's claim:

- August 23, 2021: John King, the managing director of FPL, informed Schmidt that FPL was being put in liquidation. Pl. Opp. Br. Ex. 3 at 4–5 (ECF No. 79-5).

- August 26, 2021: Hayes emailed Schmidt asking what was happening with, and would happen to, Multiscaff's scaffolding materials in light of FPL's default. Schmidt responded that APTIM intended to package and containerize all scaffolding and return it to Singapore. *Id.* at 2–3.

19

- September 14, 2021: Hayes informed Schmidt that, given FPL's liquidation, APTIM could either (i) continue with the hire of Multiscaff's material until Project completion; (ii) purchase the equipment; or (iii) arrange for immediate return of Multiscaff's property. Schmidt responded the next day, stating that some of Multiscaff's material was still in use but that APTIM was gathering that material up and preparing to ship it to Singapore. Schmidt also stated that it was still unclear what APTIM's obligations and rights were given FPL's contractual default. *Id.* at 1–3.

- September 2021: Across several emails spanning the last week and a half of September, Hayes stated that Multiscaff wished to work directly with APTIM to find a solution for the use of Multiscaff's equipment. Schmidt indicated that APTIM was planning to containerize and ship Multiscaff's materials to Singapore. At this time, a dispute arose over who bore the cost of return: APTIM indicated that it would cover the cost of shipping from Diego Garcia to Singapore, but that FPL had been responsible for paying the cost of shipping from Singapore to the United Kingdom. Multiscaff asserted that FPL would have billed APTIM for the cost of shipping and therefore, with FPL out of the picture, APTIM was required to pay for shipping back to the U.K. Pl. Opp. Br. Ex. 4 at 8–12 (ECF No. 79-6).

- October 7, 2021: Schmidt acknowledged that Multiscaff was not at fault for the situation but stated that, after consulting with in-house counsel, the FPL bankruptcy estate had not terminated or repudiated any of FPL's contracts. Therefore, APTIM could not directly pay Multiscaff as APTIM's obligation was to FPL and any money owed to Multiscaff would be a debt of the FPL estate. Moreover, APTIM had contractual offsets against FPL that could result in APTIM paying little or nothing to FPL. Schmidt also noted that APTIM had no contract requiring APTIM to pay for shipment of Multiscaff's materials and that the cost of return was a matter between Multiscaff and FPL. Finally, Schmidt claimed that much of Multiscaff's materials were being containerized for shipment that month, excluding some scaffolding needed to complete the Project, and Schmidt requested a purchase price for the material required for future use. *Id.* at 7–8.

- October 12, 2021: Hayes stated that, given the contract termination, Multiscaff did not understand itself to be under contract for the Project. Hayes noted that shipping costs had spiked since the outbreak of the COVID-19 pandemic and that it therefore could be cheaper for APTIM to buy and resell Multiscaff's materials than to pay the cost of return. Hayes offered to sell Multiscaff's equipment to APTIM and to settle all subsequent hire claims for the equipment's list price plus 50% of the hire costs up to the point of any agreement. Hayes further claimed that the cost of shipping the materials back to Multiscaff plus the cost of Multiscaff's extended hire up to that time was £893,349.72, and that approximately £1.2 million worth of Multiscaff's equipment was still on site. Hayes stated that his offer of sale was valid for the next seven days. *Id.* at 5–6.

- October 14, 2021:  Schmidt requested additional information on the state of Multiscaff's materials.  *Id.* at 5.

- October 19, 2021:  Hayes asked if Schmidt had any update on Multiscaff's offer.  The next day, Schmidt responded that he was still working on the offer and was trying to get a sense of the resale value of the equipment.  *Id.* at 3–4.

- November 10, 2021:  Schmidt explained that he was still looking for buyers of the scaffolding equipment to avoid unnecessary shipping costs and asked if Hayes knew of any prospective buyers.  Hayes offered to make enquiries the next day.  *Id.* at 2.

- November 26, 2021: Hayes informed Schmidt that a couple of buyers might be interested in the scaffolding and advised Schmidt that APTIM should promptly make a decision as the weekly hire cost of Multiscaff's materials was £12,341.66 and rising.  Pl. Br. Ex. 16 at 1 (ECF No. 65-17).

- March 2022:  Internal APTIM emails included a spreadsheet tracking the rental cost of Multiscaff's materials, among other expenses.  Pl. Op. Br. Ex. 1 (ECF No. 79-3).

Taken together, these communications fail to establish contract formation.  APTIM expressly stated that it believed that the parties were bound by their previous contractual relations.  *See* Oct. 7 Hayes-Schmidt email.  And Multiscaff did not believe any contract governed the parties' ongoing dealings.  *See* Oct. 12 Hayes-Schmidt email.  As a result, Multiscaff made a new offer for APTIM to buy Multiscaff's materials.  *Id.*  APTIM never accepted that offer, and APTIM's conduct (continuing to use the scaffolding) did not signal ascension to Multiscaff's terms.  Rather, APTIM believed that the existing contracts entitled APTIM to use Multiscaff's materials to complete the Project and obliged APTIM only to return those materials to Singapore.  The conduct of the parties — their back-and-forth negotiations over a potential sale or shipment of Multiscaff's equipment — make clear that there was no "meeting of minds" and no "tacit understanding" governing the disposition of Multiscaff's materials.  *Hercules*, 516 U.S. at 424.  These communications illuminate no more than that APTIM explored buying Multiscaff's material but never resolved to do so.  And Multiscaff cannot alchemize APTIM's exploration of an offer into acceptance of its terms.

21

*Third*, Multiscaff clings to deposition testimony of Schmidt in which, Multiscaff claims, Schmidt acknowledged APTIM's obligation to pay Multiscaff after termination of FPL.  Because the parties spill a great deal of ink over the implications of Schmidt's testimony, the relevant passage is included verbatim below:

```
24      Q.  Is there anything in this Section 25 that
25  allows APTIM to use materials on the job site upon
1   termination and not pay for them?
2               MR. KURTZ:  Objection, form.
3       A.  I don't know, but it doesn't say anything about
4   that, I don't think.
5       Q.  (BY MR. WARD)  So in other words, APTIM always
6   had an expectation that it would pay for use of
7   supplies and other expenses that were on the job site
8   left behind by FPL, right?
9               MR. KURTZ:  Objection, form.
10      A.  I didn't give it much thought, but I would
11  assume.
12      Q.  (BY MR. WARD)  You would assume, yes, you would
13  pay for it?
14              MR. KURTZ:  Objection, form.
15      A.  Yes.[18]
```

Pl. Br. Ex. 19, Schmidt Deposition, at 39:24–40:15.

Even accepting Multiscaff's characterization of this testimony, it does nothing to show that an implied contract was formed.  Indeed, Schmidt describes his understanding of the default clause contained in an express contract.  This testimony thus avails Multiscaff nothing.

In sum, the parties' conduct does not show mutual assent such that any implicit contract was formed between APTIM and Multiscaff.  Therefore, APTIM is entitled to summary judgment on Multiscaff's quantum meruit claim.  The analysis next proceeds to Multiscaff's claims for unjust enrichment.

**B.      Unjust Enrichment**

When a plaintiff can "show just grounds for recovering money to pay for some benefit" that the defendant received from the plaintiff, such claims have historically been "viewed essentially as actions at law for breach of contract (whether the contract was actual or implied)." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002); *see also* Restatement

(First) of Restitution § 160 cmt. a. (Am. L. Inst. 1937). One such claim arises as a quasi-contract, which is a "fiction of law" under which "a promise is imputed to perform a legal duty" to "prevent unjust enrichment." *Balt. & Ohio R.R. Co.*, 261 U.S. at 597; *Archawski v. Hanioti*, 350 U.S. 532, 536 (1956); *see also Spectra-4, LLP*, 772 S.E.2d at 293–94 (holding the same as a matter of Virginia law). To sustain a claim for unjust enrichment under Virginia law, a plaintiff must show that (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knew of the benefit and should reasonably have expected to repay the plaintiff; and (3) the defendant accepted or retained the benefit without paying for its value.[8] *James G. Davis Constr. Corp. v. FTJ, Inc.*, 841 S.E.2d 642, 647 (Va. 2020). Importantly, a quasi-contract will not be imposed in "every instance of what might plausibly be called unjust enrichment." *Id.* (quoting Restatement (Third) of Restitution and Unjust Enrichment § 1, at 5 (Am. L. Inst. 2011) (hereinafter "Restatement (Third) of Restitution")). That is so because enrichment becomes unjust only when it lacks an adequate legal basis. Restatement (Third) of Restitution § 1 cmt. b. This "threshold requirement" is a "rigorous test" that is "highly protective of the defendant" to address "[l]egitimate concerns about privity of contract." *Id.* at § 25 cmt. b; ch. 3, topic 2, intro. note. Indeed, because the law requires "that private transfers be made pursuant to contract whenever reasonably possible," a party cannot recover in quasi-contract when there is "an express contract covering the same subject matter of the parties' dispute." *Id.* at § 2, cmt. c, at 17; *CGI Fed. Inc. v. FCi Fed., Inc.*, 814 S.E.2d 183, 190 (Va. 2018). But an express contract "may not preclude equitable relief on the same subject matter if the contract does not cover all

---

[8] Because a quasi-contract rests on a legal obligation rather than a bargained-for agreement, a quasi-contract ignores the parties' subjective intentions. 1 Williston at § 1:6; *see also* 66 Am. Jur. 2d Restitution and Implied Contracts § 4; *T. Musgrove Constr. Co.*, 840 S.E.2d at 341 (noting that the claim can arise when the defendant has not even requested the plaintiff's services).

aspects of the transaction between the parties." Howard O. Hunter, *Modern Law of Contracts* § 15:2 (2023); *see also James G. Davis Constr. Corp.*, 841 S.E.2d at 648 (describing the notion that "there can be no unjust enrichment in contract cases" as "plainly erroneous"). For a similar reason — namely, the law's strong preference for bargained-for exchange — courts will not impose liability when the defendant "has previously paid for the goods or services in question," "even if the contract price is less than the cost or value of the performance in question." *James G. Davis Constr. Corp.*, 841 S.E.2d at 649 (quoting Restatement (Third) of Restitution § 25, at 371).

### 1.   APTIM's Motion

APTIM argues that Multiscaff's claim for unjust enrichment fails as a matter of law, because (i) the claim is barred by an express contract, namely, the FM Contract, which contemplated an extended hire of Multiscaff's equipment; (ii) APTIM had an adequate legal basis to possess and use Multiscaff's materials pursuant to Section 25 of the AF Contract; (iii) APTIM was not enriched because Section 25 granted APTIM the right to back charge Multiscaff for any additional costs for completing the subcontractor work; and (iv) the AF Contract states that payment from AFCEC to APTIM is a condition precedent to APTIM's obligation to pay its subcontractors, and AFCEC did not pay APTIM for the extended hire of Multiscaff's scaffolding. None of these arguments suffice.

*First*, Multiscaff's claim for unjust enrichment runs only from the time of FPL's termination. By that time, FPL already had purported to revoke the FM Contract. *See* Termination Ltr. at 1 (FPL's invocation of Section 25 against Multiscaff five months before FPL's own discharge). As explained *supra* § II.B., contract termination is only proper in the event of a *material* breach. Neither party has pointed to clear record evidence of what conditions

led to FPL's invocation of the FM's contract's default clause, and thus whether termination of the FM Contract was proper.[9]  If the FM Contract was revoked, then its price term for extended hire could not govern the subsequent use of Multiscaff's equipment.  But *second*, if the FM Contract was not properly revoked, then FPL would have no claim to Multiscaff's supplies, and APTIM, in turn, could not retain the scaffolding.  Section 25 of the AF Contract only grants APTIM the right to possess and use FPL's materials.  FPL must therefore had a valid claim to Multiscaff's supplies at the time that APTIM invoked Section 25.  *Third*, APTIM's claim that it was not enriched plainly fails.  As APTIM itself highlights, there was no contractual privity between APTIM and Multiscaff, and thus APTIM would have no right to "back charge any expense associated with replacement scaffolding" to Multiscaff, as APTIM claims.  Def. Br. at 20 (ECF No. 62).  By using Multiscaff's equipment, APTIM avoided the costs of sourcing a new supplier, of shipping new scaffolding to Diego Garcia, and of delay and uncertainty in completing the Project.  Such delays may in turn have caused immeasurable damage to APTIM's business reputation.  Although APTIM would have a claim against FPL for some or all these expenses, APTIM's likelihood of recovery remains doubtful given FPL's insolvency.  APTIM thus obtained an obvious benefit from instead retaining and using Multiscaff's materials.

  *Fourth*, payment from AFCEC to APTIM is irrelevant, because the terms of the AF Contract cannot obviate APTIM's obligation (insofar as there is one) to pay Multiscaff, a nonparty to that contract.  Nor is it clear that the terms of the AF Contract were not satisfied.  The AF Contract provides that "payment from [AFCEC] to [APTIM] for subcontract work is a condition precedent to [APTIM]'s obligation to pay any amount to subcontractor."  AF Contract

---

[9]  Nor has any party explained whether the FM Contract was subject to a good-faith requirement and, if so, whether FPL invoked Section 25 in good faith.  *See* discussion *supra* § II.B n.7.

T&Cs § 5.  APTIM was awarded a lump sum of $18,472,706 for completion of the Project.  *See*

Prime Contract at 1 (listing the contract price); Schmidt Dep. at 23:20–24:17 (confirming this

was the initial price paid to APTIM).  It appears that APTIM received this amount — and more

— and thus received everything that it was owed for paying its subcontractors.  *See* Schmidt

Dep. at 22:14–23:12 (indicating that APTIM was ultimately awarded $33.62 million for

competition of the Project).  Thus, if APTIM was required to retain a supplier longer than

anticipated, nothing in Section 5 would obviate APTIM's obligation to pay that supplier, as

AFCEC fully paid APTIM.  APTIM also points to Section 28 of the T&Cs, but that provision is

inapplicable.  Section 28 provides that:

> [S]hould the Subcontract Work be delayed . . . by any [] cause[] beyond Subcontractor's control . . . [and] should a delay be caused by events that give rise to a basis for additional compensation actually paid to Company by Client under the Prime Contract, then Subcontractor shall be entitled to recover only eighty-five percent (85%) of the compensation that Company actually receives from Client for the delay . . . . Recovery of compensation by Company from Client is a condition precedent to any obligation by Company to pay Subcontractor hereunder.  Subcontractor agrees that it is accepting the risk that Client does not pay for costs caused by events covered by this paragraph.

By its own terms, Section 28 governs only the subcontractor's recovery for a delay not caused by

the subcontractor and for which the Client provides additional compensation for the delay.  In

other words, if AFCEC paid APTIM due to a delay covered by Section 28, then FPL would be

entitled to 85% of that payment upon APTIM's recovery.  FPL, in turn, would owe Multiscaff

85% of FPL's recovery.  APTIM's failure to recover pursuant to Section 28 means only that FPL

and Multiscaff have no claim to *additional* compensation under that section.  It does not obviate

APTIM's (or FPL's) obligation to pay for any ongoing hire of material beyond the projected

completion date.  For these reasons, APTIM's motion for summary judgment on Multiscaff's unjust enrichment claim must be denied.

>    **2.    Multiscaff's Motion**

Multiscaff, on the other hand, asserts that the Supreme Court of Virginia's decision in *James G. Davis Constr. Corp.* entitles Multiscaff to judgment as a matter of law on its claim of unjust enrichment.  To understand Multiscaff's argument, a brief summary of *James G. Davis Constr. Corp.* and its holding becomes helpful.  In that case, the Supreme Court of Virginia affirmed a trial court's ruling that a general contractor was liable to a sub-subcontractor on a theory of unjust enrichment.  841 S.E.2d at 644.  The general contractor and sub-subcontractor were tied to an intermediary subcontractor, but no direct contractual privity existed.  *Id.* at 644–45.  The subcontractor experienced financial difficulties, its performance degraded and the general contractor terminated the subcontractor.  *Id.* at 646.  The general contractor continued to use the sub-subcontractor's materials to complete the project, but the sub-subcontractor was never paid.  *Id.*  The contract between the general contractor and the subcontractor stated that, in the event of the subcontractor's breach, the general contractor "may use Subcontractor's material, supplies, tools, and equipment to complete" the project.  *Id.* at 649 n.3.  The agreement also specified that the general contractor would "only make payments . . . to the extent that [the general contractor] actually owes money to Subcontractor on the Project."  *Id.* at 650.  The general contractor owed nothing to the subcontractor, but the trial court nevertheless held that the general contractor had been unjustly enriched by its retention and use of the sub-subcontractor's supplies.

*James G. Davis Constr. Corp.* is analogous to this case in some respects, but it is ultimately unavailing.  True, here, just as in *James G. Davis*, an intermediary subcontractor, FPL,

was terminated by a general contractor, APTIM; a contractual clause entitled APTIM to use

FPL's equipment to complete the project; a sub-subcontractor, Multiscaff, was not paid for the

continued use of its material; APTIM purports to owe no payment to FPL; and no contractual

privity exists between APTIM and Multiscaff. But that is where the similarities end. Vital to the

disposition of *James G. Davis Constr. Corp.* was the conduct of the general contractor, who

provided repeated assurances to the sub-subcontractor that it would receive payment. *Id.* at 651.

The general contractor "was aware of the [subcontractor]'s precarious condition" and was

"concerned about [the sub-subcontractor] cutting off supplies," so the general contractor

"directly encouraged the [sub-subcontractor] to continue shipping supplies" by "provid[ing]

assurances that [the sub-subcontractor] would receive payment." *Id.* at 646, 650–51.

Additionally, the general contractor's "internal communications and actions following

termination of the subcontract" were "consistent with an intent on the part of [the general

contractor] to pay [the sub-subcontractor]." *Id.* The Supreme Court of Virginia noted that this

conduct made the case distinct, "emphasize[d] the limited scope of [the] decision," and explained

that "[i]n ordinary circumstances, a supplier of labor or materials to a subcontractor will not be

able to obtain a judgment against . . . a general contractor." *Id.* at 651–52. The case is unlike the

facts at issue here and hence not controlling or persuasive.

 Applying the three-part test for unjust enrichment articulated by the Virginia Supreme

Court,[10] no doubt exists that Multiscaff conferred a benefit on APTIM. Multiscaff "provided a

significant supply of materials that [APTIM], by its own admission, used to finish the project."

*Id.* at 650. However, Multiscaff has not shown as a matter of law that APTIM should have

---

[10] Namely, (i) Multiscaff's conferral of a benefit on APTIM; (ii) APTIM's knowledge of and reasonable expectation to pay for the benefit; and (iii) APTIM's retention of the benefit without payment to Multiscaff. *Schmidt*, 661 S.E.2d at 838.

reasonably expected to pay for that benefit.  Unlike in *James G. Davis Constr. Corp.*, APTIM

did not "willingly climb[] down the chain of privity to deal directly with" Multiscaff.  *Id.* at 651;

*see also supra* § III.A. (discussing whether APTIM's conduct following termination of FPL

reflected an expectation to pay Multiscaff).  Therefore, Multiscaff is not entitled to summary

judgment on its quasi-contract claim.

 In sum, neither party is entitled to judgment as a matter of law on Multiscaff's claim for

unjust enrichment.  That claim must proceed to trial for resolution.

## IV.   BREACH OF CONTRACT

 Multiscaff's breach of contract claim is necessarily pled in the alternative to its unjust

enrichment claim.  A breach of contract arises when there is (i) a legally enforceable obligation

of the defendant to the plaintiff; (ii) the defendant's violation or breach of that obligation; and

(iii) an injury to the plaintiff caused by the defendant's breach.  *Ramos v. Wells Fargo Bank, NA*,

770 S.E.2d 491, 493 (Va. 2015).  The existence of a valid "contract vel non is a question of law."

*Valjar, Inc. v. Mar. Terminals, Inc.*, 265 S.E.2d 734, 736 (Va. 1980).

 Multiscaff advances two primary theories in support of summary judgment on its breach

of contract claim, one related to Section 25 and the other to contractual assignment.  First,

Multiscaff posits that Section 25 of the T&Cs created rights and obligations between APTIM and

Multiscaff under which Multiscaff granted APTIM the right to Multiscaff's supplies in the event

of FPL's termination and APTIM assumed the obligation to pay Multiscaff should it exercise

that right.  APTIM then breached this term when it failed to compensate Multiscaff.  But

Multiscaff never specifies which contract that it claims APTIM breached.  Section 25 is not a

free-floating term.  There is a Section 25 in the AF Contract, which Multiscaff is not a signatory

to, and a Section 25 in the FM Contract, which APTIM did not sign.  It is an elementary

29

principle of contract law that one who is "not a party to a contract cannot be liable on the contract." 17 C.J.S. Contracts § 43 (2023).  As explained *supra* § II.B., Section 25 neither creates an independent payment obligation nor obviates the requirement to pay what would otherwise be due.  Thus, when Multiscaff's equipment was retained, Multiscaff remained entitled to compensation.  But APTIM was not the party invoking Section 25, nor the party contractually obligated to pay Multiscaff.

Seeking to avoid this conclusion, Multiscaff claims that APTIM cannot disclaim a contractual relationship with Multiscaff, because APTIM brought a breach of contract counterclaim against Multiscaff.  But APTIM brought a counterclaim as a third-party beneficiary to the FM Contract.  *See* AF Contract T&Cs § 10 (requiring that APTIM "be made a third party beneficiary of all lower tier subcontracts").  Virginia, by statute, allows third-party beneficiaries to sue under a contract when the parties to the contract "clearly and definitely intended [] to confer a benefit upon" the third party.  *Pro. Realty Corp. v. Bender*, 222 S.E.2d 810, 812 (Va. 1976); *see* Va. Code § 55.1-119.  But the third-party beneficiary doctrine does not work the other way — parties may "agree[] between themselves to bestow a benefit upon a third party," but they cannot agree between themselves to impose an obligation on a third party.  *MNC Credit Corp. v. Sickels*, 497 S.E.2d 331, 335 (Va. 1998).  APTIM must still prove its breach of contract claim at trial.  But APTIM's litigating position is not an admission of nonexistent contractual privity.

Multiscaff also asserts that, upon FPL's termination, APTIM became the assignee of the FM Contract.  Section 25 of the AF Contract provides that "[u]pon receipt of any [] written termination notice, [FPL] shall . . . [a]ssign to [APTIM] subcontracts, supply contracts, equipment rental agreements and any and all other agreements, as designated by [APTIM]."  The

assignment clause thus contains two conditions. First, APTIM may seek assignment of any of

FPL's agreements upon FPL's termination. That choice of assignment is discretionary. Second,

FPL must then assign those agreements designated by APTIM. That assignment is mandatory.

Multiscaff conflates the two, however, by asserting that Section 25 by its own terms required

assignment of the FM Contract to APTIM. Assignment was only required if APTIM designated

the FM Contract for assignment. And Multiscaff points to no record evidence indicating that

such an assignment occurred. For these reasons, Multiscaff's motion for summary judgment on

its breach of contract claim must be denied, and that claim must proceed to trial.[11]

## V.   CONVERSION

Multiscaff's conversion claim must likewise proceed to trial for resolution. The tort of

conversion constitutes "any wrongful exercise or assumption of authority over another's good,

depriving him of their possession; and any act of dominion wrongfully exerted over property in

denial of the owner's right, or inconsistent with it." *United Leasing Corp. v. Thrift Ins. Corp.*,

440 S.E.2d 902, 905 (Va. 1994) (cleaned up). To have standing to bring a conversion claim, a

plaintiff must have "a property interest in and entitle[ment] to the immediate possession of the

item alleged to have been wrongfully converted." *CB & PB Enters., LLC v. McCants*, 882

S.E.2d 484, 488 (Va. 2023).[12] Thus, a successful conversion claim requires a plaintiff to prove

---

[11]   APTIM did not cross-motion for summary judgment on Multiscaff's breach of contract claim, because Multiscaff was not granted leave to amend its complaint to add breach of contract until after APTIM's motion was filed. APTIM indicated that if amendment were granted, it would file a second motion for summary judgment on the breach of contract claim. *See* Def's Br. at 2 n.1. Giving the impending trial date, however, judicial economy counsels in favor of resolving this claim at trial. *See* Fed. R. Civ. P. 52(c).

[12]   Standing is not used by Virginia courts in the modern Article III sense of the term, but in its historic context as synonymous with "a legal right to bring suit," *i.e.*, "whether [a statute] or any other source of law ha[s] granted the plaintiff a right to sue." Cass Sunstein, *What's*

(i) plaintiff's ownership and right to possession of the property at the time of the conversion and (ii) defendant's wrongful exercise of authority over the plaintiff's property in a manner inconsistent with plaintiff's possessory right.

APTIM argues that Multiscaff's conversion claim fails as a matter of law on four independent bases: (i) Multiscaff did not have a right to immediate possession of the scaffolding at the time of the conversion; (ii) APTIM's possession of the material was not wrongful; (iii) APTIM did not deny Multiscaff's ownership of the scaffolding; and (iv) recovery in tort is barred by the economic loss rule. Assuming without deciding that FPL could assert an ownership interest over Multiscaff's property without paying for it, there remains a dispute of fact as to whether FPL properly invoked Section 25 of the FM Contract, and thus whether FPL had any claim to possession of Multiscaff's material. *See supra* § II.B. If FPL did not have entitlement to Multiscaff's scaffolding, then APTIM's possession of Multiscaff's property would plainly be wrongful. *Cf. Morissette v. United States*, 342 U.S. 246, 270 & n.31 (1952) (stating that a "defendant's knowledge, intent, motive, mistake, and good faith are generally irrelevant" to a claim of conversion, even if a defendant "reasonably supposed that he had a legal right to the property in question."). Nor is Multiscaff's claim barred by the economic loss rule. The economic loss rule "provides that damages for purely economic loss, as opposed to damages for injury to property or persons, cannot be recovered in [] tort." *Burner v. Ford Motor Co.*, 52 Va. Cir. 301, 302 (2000). The rule distinguishes the law of torts from the law of contracts. *Filak v. George*, 594 S.E.2d 610, 618 (Va. 2004). To determine whether the economic loss rule applies, a court must look to "the source of the duty violated" to "determine[e] whether a cause of action

---

*Standing After* Lujan? *Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 171 (1992).

sounds in contract or tort." *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (Va. 1998). Tort law is meant "to offer redress for losses suffered by reason of a 'breach of some duty imposed by law to protect the broad interests of social policy,'" while contract law aims to "compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 374 S.E.2d 55, 58 (Va. 1988) (quoting *Kamlar Corp v. Haley*, 299 S.E.2d 514, 517 (Va. 1983)). Importantly, "it is well established that 'a single act or occurrence can . . . support causes of action [in contract and tort], thus permitting a plaintiff to recover both for the loss suffered as a result of breach and traditional tort damages.'" *Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 489 (Va. 2010) (quoting *Dunn Constr. Co., Inc. v. Cloney*, 682 S.E.2d 943, 946 (Va. 2009)). Multiscaff's conversion claim does not depend on a duty "assumed by [APTIM] pursuant to the Contracts." *Id.* Rather, Multiscaff alleges that its property interest in its scaffolding was violated by APTIM's wrongful use and retention of that material. Whether APTIM had a contractual right to the scaffolding may serve as a *defense* to Multiscaff's conversion claim, but the contract is not the *source of* the duty that Multiscaff alleges was violated. *See* Pl. Opp. Br. at 12–13 (arguing violation of Multiscaff's common law interest in the use and enjoyment of its property). Contrary to APTIM's understanding, if Multiscaff proves its conversion claim at trial, Multiscaff will not recover "its economic expectations as defined in the [FM Contract]." Def's Br. at 28. Instead, Multiscaff would be entitled to the full value of the scaffolding at the time of the

conversion. *See* Restatement (Second) of Torts § 222A cmt. c (Am. L. Inst. 1965). Thus, APTIM's motion for summary judgment must be denied as to Multiscaff's conversion claim.

## VI. CONCLUSION

In sum, the back to back clause of the FM Contract incorporated the terms and conditions of the AF Contract, with Multiscaff and FPL assuming the same relative position in the FM Contract as FPL and APTIM in the AF Contract. The default clause in both contracts, Section 25, does not impose a payment obligation on the invoking party nor does it interpose on whatever payment would otherwise be due to the defaulting party. With that understanding in mind, Multiscaff's claim for quantum meruit must fail because, viewing the evidence in the light most favorable to Multiscaff, Multiscaff and APTIM did not form an implied-in-fact contract. Multiscaff's remaining claims must proceed to trial for final resolution. Accordingly, the Court will GRANT IN PART and DENY IN PART APTIM's motion for summary judgment (ECF No. 61) and will DENY Multiscaff's motion for summary judgement (ECF No. 64).

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: January 22, 2024